Case number 21-5195, Matthew D. Green, et al., at balance, v. United States Department of Justice, et al., Ms. McSherry for the at balance, Mr. Tanney for the appellees. Good morning, Ms. McSherry. I've advised the timekeeper that I'd like to save two minutes. May it please the Court, Ms. McSherry for the appellants, Dr. Green and Dr. Huang. However well-intentioned, Section 1201 of the DMCA has burdened expressive activities from the beginning. And Congress knew it would, which is why it tried to fix that problem by building in a variety of statutory exemptions and hunting to the Library of Congress to take care of the rest. But that attempt to solve one First Amendment problem only created others and reinforces Section 1201's fatal flaws. Let me unpack this. First, Section 1201 directly burdens core expressive activities like accessing and sharing information, publishing books, making films, understanding and teaching about code, engaging and sharing security research that protects all of us, and many other uses. Those burdens are content-based on the face of the statute. It says some people... I'm sorry to interrupt you, but you talk about the face of the statute. Could you first start by responding to the government's argument that the only thing properly before us is the as-applied challenge? I'm sorry? The as-applied challenge. We don't have jurisdiction to hear your facial challenge. That's incorrect, Your Honor. And the reason why is because the facial challenge and the Court's ruling on that challenge is inextricably linked with its decision on the preliminary injunction. But the government's point is they're not. One doesn't decide the other. They're independent. The facial challenge resolution doesn't resolve the... The facial challenge could resolve the as-applied, but the opposite's not true. I think the way the Court should look at this... Is that right? What I just said right or wrong? That's incorrect. So all of these challenges are before the Court, and the Court should start with the facial challenge. Why are they inextricably wound up? The Court's ruling on the... I might back up. I think it helps a little bit to understand the procedural posture here. When we first brought our case five years ago, we moved for a preliminary injunction motion at the same time as the government moved to dismiss. The District Court decided it did not want to reach our preliminary injunction motion until it resolved the motion to dismiss. Three years later, we got that ruling. I don't mean to... I am interrupting you, but it's because we know. Okay. I just wanted to explain why we're in this somewhat unusual posture that we're in. It was not necessarily our choice. But nonetheless... Inextricably wound up. But when the Court... When we brought our second preliminary injunction motion, we brought it on all of the claims, including the previous... The Court then denied that motion. But it denied the preliminary injunction motion for the dismissed claims for the simple reason that those claims had already been dismissed. It denied that motion by referring back to it. And also, in its court order, it refers to... Let me take another shot at Judge Steele's original question. Let's say we find that you don't have jurisdiction, or we don't have jurisdiction, on the claims that were dismissed. And we deny your preliminary injunction for the as-applied claims. This goes back to the district court. Eventually, there's a final judgment. You appeal the final judgment. And on that appeal to our court again, are you going to tell us that the claims on appeal, which were originally dismissed... Are claims that you cannot win on because they are inextricably bound up with the claims you lost on the preliminary injunction decision? I think that we would be appealing both... You're not going to make that argument, correct? Yes, I'm probably not going to make that argument. You're going to say that you can still win on appeal of the dismissed claims after final judgment, even if you lost today on the preliminary injunction as-applied claims. That is correct, Your Honor. That seems to answer the question of whether they are inextricably bound up. Well, I don't think that completely answers the question. And I would point out another basis for your court to review the facial challenge, which is that in First Amendment cases, the court has a special obligation to review the whole record and consider the whole record to ensure that there has not been a First Amendment injury. And I would submit to you that my clients are suffering ongoing First Amendment injury right now, having waited for five years to even be here and able to get injunctive relief. We have an ongoing injury happening, not just with respect to my client, but with respect to all of the third parties who are not before the court right now. I'm going to shift topics unless Judge Tatel or Judge Rodgers has a jurisdiction. Let me give you a hypothetical. Let's say that I am able to develop a code that allows me to break into ATMs and get as much money from those ATMs as I want. Now, let's say I want to traffic in that code. I want to sell it or even just give it away. And I make this argument. There will be some times when the code is used by a person who has money in the bank and will only take out as much money as the person has in that bank. Sort of the fair use analogy. But, of course, we all know there will be plenty of times when someone uses that code to take money from the ATM that is not the amount of money that person has in the bank. Do you think I would have a First Amendment right to traffic, to sell, to share that code? I think that if you wanted to engage in that activity, if you wanted to share the code for purposes of educating others, then I think what you would have to do is you would apply First Amendment scrutiny to that activity. Now, maybe we'll see what the results of that scrutiny was, but it would still be because code is... I think I understand your answer is that I said, would you have a First Amendment right to sell that code? And your answer is maybe. Well, my answer is you would have a First Amendment right to appeal, ask for First Amendment scrutiny as to whether that activity was okay. I'm asking, would you win in your First Amendment claim? And I think your answer is maybe. You don't have to say yes or no. It may be that the correct answer is maybe. Well, I'm trying to avoid fighting the hypo, but I think really what you would be doing if you were sharing the code is you would be sharing instructions for how to do something. And that is activity that's infected with expressive purpose and therefore covered by the First Amendment. Maybe you would have a successful First Amendment. I think it might be a challenge as applied, but that's certainly not the situation that we have here with the DMCA because it reaches far, far beyond that. Let me ask one more question, then maybe I can get out of my colleague's way here. Based on the complaint, how much of the code did Dr. Green plead that he wants to include in the book? Some of it or all of it? What Dr. Green would like to do would be to include snippets of code. Just snippets. Just what? He would like to include sections of code enough to show how he circumvented. Would someone with that amount of code be able to use it effectively to access copyrighted materials? Someone would be able to use that code to replicate his research, and so potentially, yes. I mean, that is part of what you have to do to circumvent. What difference does it make if it's only part? Your whole point is he's going to release, he's going to deliver enough, put in the book enough code for people to avoid copyright restrictions, right? In other words, if I picked up his book, I could use his code to download an e-book and not pay for it, right? Not necessarily, Your Honor. He does need to release enough for others to be able to replicate his work, so he would need to release enough so that they, too, could circumvent. Just answer my question about the e-book. Is there enough code in there for me to download a copyrighted e-book? I think if you were technically sophisticated and able to implement that code in a way that most people are not, possibly, but the idea that his audience is going to be other researchers and the public, not for purposes of engaging in any kind of infringing activity, but to actually share information that will help people be more secure. He can do that under the existing exemption he has. The only reason, maybe I'm wrong about this, but he has this exemption, right? He can do that. He's got this, quote, temporary exemption, so he can do all that with his code. He can use it for research. What he can't do, or at least what he thinks the statute prohibits him from doing, is violate the anti-trafficking provision, right? That's what this is about from his point of view. In other words, if there's a potential violation of the statute for him, it's not the anti-circumvention provision, because he has an exemption. It's the anti-trafficking provision, right? It is certainly primarily the anti-trafficking exemption. Why do you say primarily? In addition, so Dr. Green is covered by a temporary exemption now. But starting next fall, he and many, many other people are going to have to go back to the Library of Congress once again for permission. Okay, but that's not before us now. Who knows what's going to happen? He claims now that this statute, the anti-trafficking provision, violates his First Amendment rights. And that's the question before us, right? Can he put the code in his book? A sufficient amount of code for people to actually circumvent the copyright restrictions, right? That's what this is all about, isn't it? That's most of what it's about with respect to Dr. Green, if you choose not to reach the facial challenge. Yeah, let's assume we're not, exactly. Well, I didn't say exactly that that's right. I said, yes, my question is based on the as-applied challenge. Okay, so, and Mr. Wong, your brief lists all kinds of different activities that people won't be able to undertake with this net VCR device, right? But these are all examples of other people's speech that could be facilitated. From his point of view, what he's prohibited from doing is using this code he's got, this VCR thing. He can't sell that. That's what he says he can't do, right? And that's your First Amendment claim, isn't it? You can't make a First Amendment argument on behalf of people who aren't here. The question is, is his First Amendment right restricted? And your argument is, yes, he can't sell his, what do you call this thing, something VCR? What is it called? It's the, his net VCR, the net VCR. Isn't that what your case is about? No, Your Honor. So, Dr. Wang, first of all, is burdened under A1 as well as A2, so not just trafficking, but his ability to access code for his own personal use. He wants to engage in digital analysis for his own personal use. Well, he could apply for an exemption. He could apply for a temporary exemption. He did apply for an exemption, and it was refused, which is why he, in particular, raises questions about the speech licensing regime that Congress put in place in the form of the Library of Congress rulemaking. He tried to use that process. He went through all the burdens that process involves, and he was denied. So he is concerned about that process as well, not just the trafficking. I see. I see. And I would point out that the device that he wants to share, he wants to do two things. One is he would like to share code so that people who already have the net TV can upgrade there to a net TVCR. And also because he wants to share the code in such a way that others can edit, comment, redo it, make it better, make it more effective. So he wants to share code as well as marketing a device. But, again, he has also burdened himself in engaging his own expressive activities and also in having received a pretty peremptory denial for his request from an exemption. The Library of Congress said, there aren't enough of you to be worried about this particular use, and therefore we're not going to give you an exemption, which is a fine example of how the Library of Congress exercises pretty unbridled discretion with respect to what kinds of exemptions are in place. What kinds of exemptions are not. Which, again, is content-based in the statute. You can see it. It's written in there, the Library of Congress must favor some purposes over other purposes, some uses over other uses. In practice, that's exactly what it does. You can make a documentary film, but you can't make a Western or many kinds of narrative films. That's what happens. You can engage in some kinds of protective activities, some kinds of educational uses, if you are teaching in K-12. So different rules apply to K-12 than apply to university professors. The history of the rulemaking, which is in the record, is riddled with these kinds of exemptions that are, in many cases, incomprehensible to the people who are trying to take advantage of them. They have to figure out how to comply. Do you think that the Supreme Court's case from last term about the billboards, I think it was in Texas. You know the case I'm talking about? I'm sorry, I don't remember the name of it. The city of Austin billboards case. Do you think that the court is beginning to give lower courts guidance along the following lines? Content-based versus not content-based. Intermediate scrutiny versus strict scrutiny. These are distinctions that confuse more than they clarify. A proper inquiry is a look into history, tradition, perhaps analogies, in order to find out, is this the type of speech that has historically been protected or was protected at the time of the framing or the 14th Amendment or not? Do you think that's the guidance that they're giving us or would I be reading way too much into the city of Austin? I think that what the court has been doing over the past decade, and I might begin with Sorrell and read, I think what the court is trying to do is give guidance as to what you should look at when you're looking at a statute. And it should not just be the motive of the government, which may not be apparent on the space, but whether certain kinds of speech are being called out because the roots of the First Amendment is a care to ensure that we don't have a position where the government is favoring certain kinds of speech over others or certain kinds of speakers over others. So a caricature of Reed, which I'm not endorsing, but it would be, is it content-based or not content-based? Ah, in Reed, it's content-based. Therefore, we turn on the switch for strict scrutiny and the government loses. And city of Austin seems to cut back on having that much hinge on whether it's content-based. I don't think that's how I would interpret what the court is suggesting there. I think what the court is asking in city of Austin is, is this the kind of intervention and is this the kind of rule that we should be worried about particularly? And trying to inform that. And I would suggest in this case, it's exactly what we have here. And two decades shows it. We have a government official exercising extraordinary discretion based on very unclear standards. They get to just consider adverse effects and such other factors as they might want to pay attention to. And it's very unclear. It changes every year. The rules change every three years. And attorneys, student attorneys and people all over the country then have to go to the office and go through a mini, basically a mini motion. And with briefing and defense and witness testimony and all of these things, and then wait for years to find out if they get an exemption or not. That's what Dr. Wang had to do. Let me just maybe, let me just focus on, I want to follow up on Ted Walker's question about the city of Austin case. But, okay, so if I, if I'm looking at just, just one and just his, the anti-trafficking. So his device or his code, as I understand it, which he wants to sell will enable purchasers to circumvent copyright protection, right? Set aside the research. I understand your point about that and all the standards and that he wants to research. But just this part of the case, that is, he wants his code if he wants to sell a code that will enable people to circumvent the copyright, right? Or non-infringing purposes, correct? Or you want, I'm sorry. But wait a minute, for non-infringing purposes, if I buy his code, am I going to be able to download an e-book for free? Not necessarily. What you, what we would be able to do is be able to take your e-book that you already have and actually fully investigate the software in it and potentially improve upon that software. So it's actually more. You're telling me then that his device. So take, suppose I, suppose I download a library book. Okay, and, and let, let's assume that the library book is good for 21 days. Would I be able to circumvent that with his device, with his code? It would depend on the digital rights management that happens to be on the book. Potentially. Sometimes, yes. Sometimes, yes. All right, yes. Okay, all right. I'm not a technologist. So we, we agree that, that this code, you're agreeing with me then that his code can be used to circumvent a copyrighted vision, right? A copyrighted document or book, right? Yes. Okay. So, and let's assume, I assume for a minute, I agree with you that code of speech, because I don't think the government's disagreeing with you. As I read the briefs, it's all about whether it's content. It's not speech. So let's assume it is speech. Why isn't it completely controlled by the case Judge Walker mentioned, Austin, City of Austin? Because, yes, you have to look at the code to see what it does, just as you had to read the sign in City of Austin. But it was a totally functional, all it did was, it was completely functional. It, it, it was totally functional. That's all. It didn't, it, it, it, I'm just looking for the language here. Yeah, see, it ultimately, the distinction it made was not based on content, but on location. That was all. Just like here, it's not based on content, it's based on function, the ability to circumvent copyright, copyright. The cases seem identical to me. So, the distinction, Your Honor, is that what, with respect to whether it's content-based or not, because we haven't reached intermediate scrutiny yet, but with respect to whether it's content-based or not, the, the difference here is that the code at issue here, the, that he would like to provide directly, and the regulation against it, directly targets expressive activities, necessary predicates to speech. Whose expressive activity? The, well, his own, for one thing. No. And, um. Wait, but what? Other people's. Well, expressive in the sense of he is not able to share this code. I'm not talking about that part of the case. I'm only talking about his desire to sell this for, to people who want to circumvent the copyright. That's all. So, the sale of code is also expressive. I agree. I didn't, remember I said to you, I'm willing to concede that it's expressive. I just don't understand why, given the city of Austin, it's content-based. That's all. I think, I think the difference between the city of Austin and here, in the city of Austin, the question there was, is something, it was based entirely on location. But you had to read the sign to know whether that's what it was all about. And the court said that didn't make any difference. Correct. But I think. That's just like here. You have to read the code to know what its purpose is, but its purpose is to circumvent. So, it's not, so it's not content-based. So, in the city of Austin, the question, what the court said was, the regulation itself does not call out content. It just calls out location. Here, we have a regulation that specifically does call out content. And on its face, it calls out expressive activities. I have a question about standing, but before we do that, Judge Rogers, do you have any questions? No, I think Judge Tatel's covered. This is something of a friendly question, but to have standing, I think you need to show credible threat of enforcement or credible threat of prosecution. I'm going to ask the government about a sentence in a district court response when it's the government's turn, but I want to read this sentence now so you can say why there's still a credible threat of prosecution in light of this sentence. This is from the government's response to the preliminary injunction motion, ECF 38 of the district court, page 35. The government says, the complaint's sparse description of Green's planned book is devoid of any factual assertions that would bring the book within the ambit of the anti-trafficking provision. So what Dr. Green's declaration explains is that he would like to write a book, and here is how he would like to market it. And it's clear from the marketing he might do that the fairly construed statute could apply its provision on marketing or commercial gain to Dr. Green's activities. I would also point out that the government has said twice that it might be fine with Dr. Green publishing his research. And even aside with whether we have to trust the government's good behavior, which we know that we don't, to decide this. Secondly, the government's been explicit that it believes that Dr. Green can engage in his research and publish his book without actually providing examples of code, which suggests that the government only thinks that he's excluded from the statute if he promises not to publish any excerpts of the code. But presumably his declaration that he intends to publish enough code for it to be used, circumvent, was within the complaint or would have been covered by the government's position that the complaint is devoid of any factual assertions that would bring the book within the ambit of the anti-trafficking provision. I understand that the government says that, but that is not a fair reading of the statute. And we know that the way to read the statute is what it could reach, not what the government imagines it might reach or promises it will do or will not do. And frankly, the Library of Congress has conceded, I'm sorry, what we know is that he needs to share enough, and this is in his declaration, he needs to share excerpts of code so that other people can replicate his work and improve on his work. That is how security researchers engage in discourse. That's what they do. It sounds like your argument is there's a credible threat of prosecution because he is violating the statute. He wants to violate the statute. He wants to violate the statute. It's not the entire Susan B. Anthony test for whether there's a credible threat of prosecution, right? I think that we're in a posture, and the district court also seemed to accept this posture, that if the government promises that it doesn't think there's a problem, there's not a problem. And that I think is not, and it's from our position, the question is whether the statute fairly construed inhibits speech, and it most certainly does. And in fact, what you also can see from Dr. Greene's declaration, it's not only his speech that's inhibited. There are people in his field that have simply left the field altogether because they're concerned about this. Judge Rogers, anything else? No, thank you. Thank you very much, Ms. McSherry. We'll hear from Mr. Tenney. We'll give you a couple minutes for rebuttal. Thank you, Your Honor. May it please the court, Daniel Tenney for the government. I'd like to start with what Mr. Wong wants to do, because I think that clarifies both the operation of the statute and its evident purpose. The technology he wants to sell would allow anybody who had access to any video stream. So if you rent a movie, if you buy a movie on a DVD, if you access it online, to strip away the content protection. So that instead of having an encrypted copy of the movie or one subject to the access restrictions that the content provider attached to the movie, you would have access to a free unencrypted copy that could then be used by you however you want, could be rapidly disseminated around the world over the Internet at the click of a button. And that's what Congress didn't want people to be able to do. And the reasons that it wanted that was that it wanted digital providers to be willing to provide their works to the public without being afraid that they would be stolen. Right. That copies would proliferate. And so that that explains both the basis for the statute and why both, you know, in general and as applied to Mr. Wong, why the statute is perfectly consistent with the First Amendment. Can you address this? This quote that I read earlier on the DOJ's response motion? Sure. Do you still agree? Yes, we do. And so that means that Green is Green does not as Green has not described anything that would violate the anti that he wants to do. It would violate the anti-trafficking. That's correct. So. If if that's the government's position and Green's complaint says he has a legal right to do what you say he has a legal right to do, that would seem to check the box for Green's likelihood of success on the merits. It's the first factor in the preliminary injunction. Right. He's likely to succeed on the merits of his claim that he has a lawful right to publish the book he wants to publish. And I don't I don't understand. I mean, you can't bring a claim and say, here's the thing I want to do. And you get an injunction. Right. So that gets into the standing question. But, well, no, I mean, he would. The claim on the merits is that the government is threatening to do something to him that's unconstitutional. That's his claim on the merits. And if he's wrong that the government's doing anything to him at all, then then he doesn't have a First Amendment claim. I know I'm I'm open to being talked out of this, but it seems like the first inquiry is standing. So we first have to determine whether there's a credible threat of prosecution. The government's litigating position in this case would be one factor in that inquiry, but it's not necessarily dispositive. And if we get to the point where we find that there is a credible threat of prosecution in the future. And that, therefore, Green has standing, then we would address the four factors to go into whether he's entitled to a preliminary injunction. The first of those factors would be whether he's likely to succeed on the merits of his claim that is legal for him to publish the book that he wants. And at that stage, we would say it is legal for him to publish the book that he wants to publish, if only because the government has conceded that it is. I'm not trying to quibble here that the parties agree that it's legal for him to publish the book that he wants to publish. His claim is that the Digital Millennium Copyright Act is in some respect unconstitutional. That's what he's asking the district court to say. And he's asking the court to issue an injunction against the government. Can I just interrupt? It's a clarifying question here. So the code he wants to put in the book will not violate the anti-trafficking provision. She just counsel just told us that Green's code could be used by people who get by the book to circumvent the copyright. Well, I mean, that's your whole theory, isn't it? I mean, I have a few responses. The answer to your direct question is no. We don't think the book would violate that putting the code in the book. Well, I mean, the thing is, the code in the book is a book is something that's read by a human being. And then a human being, as I think opposing counsel also pointed out, a human being might take that code and turn it into something that that might. So now I'm completely confused. OK, suppose it's a hundred page. Ninety nine pages. They're all about. Computer code, general analysis, history and technology. But one page has his code. And if I bought the book, I could take that code. I could buy his book for $30. And with that code, I could then I could then circumvent the copyrighted materials that Congress is trying to. Isn't that what. He's saying he wants to do and that the government that would clearly violate the anti-trafficking provision. Well, I just want to go to that. If that's not true, then I've totally misunderstood this case. I think that is what he's saying he wants to do. I think the anti-trafficking provision is a bit narrower than the question suggests. So I just want to go to the text of the provision if I might. It's traffic in any technology, product, service, device, component or part thereof. And then there are three. It has to satisfy one of three criteria. It's primarily designed or produced for the purpose of circumventing a technological measure. It has only limited commercially significant purpose or use other than to circumvent a technological measure, or it's marketed by that person for use in circumventing a technological measure. So the point is that, first of all, it's not even clear that a book is a product, service, device component in the same sense. It's not like a computer program that you click the mouse and then you use the book to circumvent. You are a programmer. You read the book. It provides information to you. And then maybe with that knowledge or maybe by copying some of the text of the book, you would create yourself a product. I just want to get crystal clear on the record. Is the following statement correct? It's legal for Green to publish his book even if the book includes enough code to allow someone to piece together a circumvention technology. Is that correct? That is correct. So this is the weirdest posture for a case. Green is saying that what he wants to do will violate the statute. And you're saying what he wants to do will not violate the statute. Yes. And the district court agreed with us. I guess my question is, what are we supposed to do with that? Why is there – do you think he has standing to bring his as-applied claim with regard to the anti-trafficking provision? No. And make the – what's the argument for why he does not have standing to bring that claim? Well, because the claim – I mean, it would have to be that – I mean, it would have to be that he wants to engage in conduct that violates the statute, which he doesn't. So let me stop you there. Imagine – I mean, we might have to write this. Imagine that the court concludes the statute does prohibit his book. Then he would – Then he would have standing? Well, I mean, then you would get to the credible threat of enforcement. So would there be a credible threat of enforcement in that situation? No. So what's the argument for why in that situation, after the court has concluded that the statute prohibits his book, there is nevertheless not a credible threat of prosecution? I mean, I guess it gets – I mean, I guess you'd have to say whether – I mean, if the government's consistent view is that it doesn't, then the government has said we're not going to prosecute. I mean, it's only the government's view in this one case. I'm not sure it would bind a future U.S. attorney. And even in this case, I'm not sure it's been the government's consistent view. I think it's not a criticism of you specifically because there's a lot of – you know, a lot of paper has been filed on this case, a lot of water under the bridge. But I'm not even sure it's the government's consistent position in this case. I think it has been. I'm not aware of a circumstance where the government has taken a different position. Let me put this another way. If the government were to prevail in this appeal on the ground that Mr. Green's conduct that he – as described – I'm not saying any conduct that might be different, but as described in the complaint and in his declaration in this case. If the government were to prevail in this appeal on that ground, then of course we couldn't then turn around and prosecute him. I mean, maybe you could speak for whoever the next attorney general is, but – I don't think that the government, having litigated against the same litigant and persuaded a court to reject – That would help us decide Green's as-applied anti-trafficking claim. If what you just said is correct, what's the best case to support that? I'm not saying you're wrong. I mean, I would think judicial estoppel cases would help there. I'm trying to remember the names of them. I think New Hampshire is one of them. But, I mean, before we get there, because we're not asking you to dismiss his complaint. He wants a preliminary injunction. Does he have irreparable harm that during the pendency of this litigation he's going to be prosecuted for that? I mean, that has to be an easier question. We just shouldn't have to tarry long on Dr. Green because he has basically two claims. One is circumvention where he has an exemption. The other is trafficking where the district court and the government agree that what he's doing doesn't violate the statute. So it should be clear enough that he doesn't get a preliminary injunction. How the district court handles whether to dismiss his case entirely, and he can appeal from that later, can be taken up at another time. So I think that should put Dr. Green to one side. I want to focus on Mr. Wong because – Before you go into Mr. Wong, let me just ask you a question about both so that I understand what you just said. Maybe my oversimplification is the wrong way. Okay. They both have this line of code. They both have a line of code. And according to the record and what counsel has said, that code can be used by someone who gets it, buys it, or reads it in a book to circumvent a copyright claim. Right? They both have that. They both have that capability. I think so. I want to be careful about exactly what it means to use code that's written in a book, but I think I understand where you're going. Yeah, okay. So the difference between the two of them is that Wong's net VCR device is the code. That's it. Whereas Green wants to put it in one page of a 100-page book. Is that what distinguishes – is that why Green's okay and Wong isn't? Suppose Green's book was only two pages. I think so, but there's a few distinctions that are baked into what you said, so I want to just unpack them a little bit to make sure we get all of them on the table. One is that what Wong is sending people is a computer program. And so you or I could take that computer program and click on the mouse, and we know when we buy computer programs, we can just use them. We don't have to read them or understand them or know what they say. We just click them, and they do things. Right. We hope. We hope, right. Well, they do things, whether they're what we want is a different question. And Green is not selling or providing anything like that. He's not saying here's a thing that you just sort of click the mouse right here, and then it decrypts the video. That's not what he's providing. What he's saying is he's got some text, and in the middle of that text he says here's the program, and you would have to know what to do with the program and where to put it and how to install it into whatever else you're doing. So that's one difference. Okay. Now the other difference is the purpose for which it's marketed, and that's relevant on the text of the statute. The statute talks about whether the only commercially significant purpose or whether it's marketed for the purpose of circumventing. And what Green's trying to do, as I understand, and we take him at his word for this, is educate. He's not trying to circumvent. And the statute makes that textually relevant, too. And so it's not so much the number of pages in the book. It's both the form in which the code is provided and the way in which it's marketed and who it's marketed to and for what purpose. And those are all relevant on the face of the statute. And, you know, if you had any. And so that's why they're so different. I guess what's really confusing is after Congress has written a statute where it tries to define the term and what it means and give you the three examples. Here in Judge Tatel's careful questioning of counsel, I thought it was conceded, ultimately, that there was enough in the book to cobble it together. So that a knowledgeable person could in fact circumvent the statutory restriction. And counsel said was also another problem. So I thought counsel was acknowledging that a literal reading. Just because I don't tell you how to get from here to New York doesn't mean I haven't given you enough information. By a longitudinal attitude about what trains and planes go that way doesn't mean I haven't undermined the whole purpose that Congress had in mind in trying to protect copyrighted materials. And it seems to me your argument. And maybe this is correct, is that is way too broad of a concession. That even if you could cobble together from Green's book. That's not his purpose. And so there's no problem with the circumvention issue. Wong, on the other hand, is just sending it out there for me to use without cost, and I can click on the program and get the downloaded protected material. So, I think it's an interesting argument, but I wonder, in other words, is the government's concession such that looking ahead to what might happen to this case in the future. It has taken this position that at least when I first understood this case did not necessarily follow from the plain text of the statute. Your Honor, if I might, I'd like to go back to the plain text of the statute and explain why the idea that anything that might ultimately have the effect of allowing people to circumvent can't be the outer bound here. But have you added a subjective intent provision here? That even if people can do that, if I don't intend for them to be able to do that in writing my book, that controls. Your Honor, we haven't added it. I'd just like to read, again, the three categories that Congress set out. For the purpose of. And just because I say it's not for that purpose, if it's obvious, it can be used for that purpose. Why isn't it? You see Congress as having added a requirement that the court find a specific intent to violate. I mean, you're under Congress put in three categories and they are intended to, I think, capture what you are concerned about here, which is the first category, but not according to your reading. I, I'm not, I'm not sure my reading really, really parts company with what you're trying to get at, but but if I could just go through them. So, you're saying if Dr. Green doesn't intend to circumvent. The statutory restriction. He's he he avoids any fear of prosecution by the government. I don't think that's entirely true. I think that would probably take them out of to a. So, I have to deal with 2B and 2C. I think he easily satisfies those. So, I'm not trying to say Dr. Green is going to be prosecuted here. But what Congress was trying to do is say, look, if you have a device and the purpose of your device, and this is a, if you design something to allow people to circumvent. That that's you can't traffic in that. And then the 2nd thing is, okay, if you have something, and the only, you know, the only, the only, there's a, there's very limited commercially significant purpose other than circumvention. So, maybe you say, oh, no, it's not to circumvent. It's for this totally different thing. You say, but the only reason anybody wants this device is that they want to circumvent. So, they're buying it for that. Then you can't do that either. That's B. And then C is if it's marketed for use in circumventing. So, if you have something, even if it has a bunch of different purposes, but you say, hey, everybody, there's this great thing that you can use it to circumvent devices, you can't do that either. And there's reasons that Congress would want to do it. So, if you're reading a specific intent requirement, and you read B as what the recipient's intent is, is it irrelevant? I don't read B as having a specific intent requirement, and I don't know that it has to do with the recipient's intent other than the intent to do the thing that's described in B, which is if the recipient uses the technology to circumvent a technological measure, and that's, and it has limited commercially significant purpose other than that, then it's covered. And, I mean, it makes perfect sense that Congress would do it this way. And this goes back to what I said at the beginning. What Congress wanted to avoid is that you sell devices so that people can just decide, okay, if I'm going to rent a movie, do I want to only have access to the movie on the terms that the person who rented it to me wanted to give it to me? Or do I instead want to have access to the movie in whatever way that I want? And I think a lot of people would buy, if both were legal, a lot of people would buy the second one. And Congress said, well, we don't want people to have that access. We don't want people to be able to take a movie that they rent for 48 hours and make a copy of it or view it on a device other than the one that they were sold permission to view it on. And that's what Congress was getting at. That's consistent with the First Amendment. That covers what Mr. Wong wants to do, and that's why Mr. Wong is not entitled to relief. Okay, I understand your point about Dr. Green now. And about 20 minutes ago, I interrupted you when you were about to transition to Wong's case. So would you do that now? So as I understand that, as I understand the government's position, you're not, government doesn't argue that code isn't speech, right? You're just arguing it isn't content, right? Well, so the Second Circuit addressed this well in Corley. The code has sort of a functional component and a speech component. So at least some code does. So some software can be exhibited in a way that's readable by human beings. Is this a difference between object and subject? It relates to the difference between source code and object. I'm sorry, source code and object. But the point essentially is software is sort of a hybrid thing, at least in some forms. It's like, let's just take source code to make it simple. So source code is written in words, you know, or computer language. So programmers can read it. That's one thing that it does. So you could write it and a programmer could read your code. And that is what the Second Circuit said, and we agree, is expressive. If you write code, somebody can read it. The other thing it can do is without anybody reading it, it can give instructions to a computer to do something. And what Congress was worried about in this statute was that second thing, the functional thing. So Congress doesn't care if somebody can read it or not. If you write code that was just sort of ones and zeros and gibberish and unreadable by any human being, it wouldn't have any of the expressive content. But Congress's interest in regulating it would be exactly the same, because what Congress cared about was the functional capacity of the code to instruct a computer to do something. And that's why this is not a content-based restriction, because it's not concerned about the expressive content. In fact, it's just it doesn't matter whether the thing being regulated even has any expressive content. It's regulating conduct, the breaking of the protective measures. And its regulation of that may have the incidental effect of making it more difficult to express things. If you express things with computer code, that also has this conduct, but that's an incidental effect. That's not the target of the regulation. And that's what the Second Circuit said in Corley, and that's what's happening here. And that's why, in this case, it's easier than the city of Austin, because city of Austin, at least, they were regulating speech as speech. They were saying, here's what you can say and here's what you cannot say. And here it just happens to limit in some circumstances. And then, as we've discussed at some length, to the extent that they're regulating the expressive part, talking to other people, it's narrowed in significant ways. So what about counsel's argument? I get that. I understand that. What about counsel? Because when I asked counsel about that in her argument, she said, oh, it's much broader than that. Mr. Wong wants to want other people to read his code and understand it. He wants to educate with it. What about all that? Right. So we're not we're not saying that it doesn't have any effect on expression at all. We're saying it's an incidental effect and that it's amply justified by Congress's desire to regulate the functional capacity, the conduct that's involved. And the point is, yeah, you could have a program and you say you want people to read it. But if it also allows everybody to unlock every video that's sold by anybody with any encryption system whatsoever, and then to make copies and distribute them all over the Internet at the click of a button, the district court properly held that Congress's interest in doing that is sufficient to override his interest in having people read his code. OK. And the difference between that and Green's is that Green's putting code in the book isn't anything like that. Right. It requires knowledge. It requires someone who understands how to convert. It's not a device that you can hit a button and download a movie that's restricted. Right. Exactly. That's it. That's it. All right. Thank you. That's the purpose of interpreting the statute. Statute uses phrase purpose of circumventing in a two day. And when we're trying to figure out meaning of that word purpose, we look to the purpose of Green's book. Or do we look to the purpose of the code in Green's? It's hard to divorce one from the other. I mean, the. The code, as it appears in the book, is designed to be read by a human being. It's not something that goes into a computer. And so the code within the book sort of has the same purpose that Green attributed to it. Also, you see, I'm not sure how easily you could separate those. I mean, I'm not sure either. But Green says the purpose of his book is anti circumvention. And the purpose of the code itself. Is circumvention. So it seems like the purpose of the book and the purpose of the code are opposites. Well, the purpose of the book is education and the purpose of the code in the book is also education. He says the purpose of the book is to educate people about preventing circumvention. And the code educates people about how to circumvent. Right. I just I'm not sure either of those things is covered by the statute. The point is the government, your position is it doesn't violate the statute. Right. We would have a different case if you said if the government's position was this violates the statute, then we'd have to figure all this stuff out. But I mean, given what I've heard today, would would the right disposition of this appeal be to say, you know, to remand it to the district court to dismiss Dr. Green's case? There's nothing he wants to do that violates the statute. I think that's what should ultimately happen in this case. I'm not sure that's the disposition of this appeal. This appeal is the appeal of the denial of a preliminary injunction. So you just affirm and say he's not entitled to a preliminary injunction. Oh, I see. And then that's why I mean, that's why some of these questions we haven't fleshed out. We don't have to get into the question under your theory of irreparable injury or likelihood of success on the merits or anything, because what he alleged he wants to do does not violate the statute. Period. Right. Right. There are a number of legal doctrines you could use to make that point. But I mean, irreparable injury is an easy one. He doesn't have any, you know, nothing's going to happen to him. And I suspect his attorney is going to pick it up in a moment. Ms. McSherry, if I were her, I would say there is irreparable injury because he might get prosecuted by an attorney general a year from now or two years from now who's changed their mind about the meaning of this. I mean, I guess I have a few responses to that. This is a preliminary injunction, so he needs imminent direct injury. That's sort of the simplest answer that doesn't get into the roots of any of the statutory analysis. We stand by our position about the statute. I'm not running away from it. It's hard to imagine, given what's happened so far, that, you know, while this case is still pending, if the district court and this court affirmed, you know, denied it, if the district court denied a preliminary injunction and this court affirmed on the ground that what he's doing either is not violating the statute or the government saying that it isn't, then there's a sufficiently non-speculative chance that someone's going to turn around and prosecute him. And I guess that's actually the irreparable injury inquiry is, is there going to be irreparable harm between this moment and the conclusion of the district court's case? Right. And especially given what's happened, it just seems clear that's not true. Unless there are any further questions. Judge Rogers? No, thank you. Thank you very much, Mr. Tenney. Ms. Sherry, I'll give you two minutes. No, it's been a long morning, so I will. So why is Dr. Green bringing this case? Why is Dr. Green still in this case? Yeah, because the government just said, you know, everything he wants to do is okay. And if we put that in our opinion, doesn't that give Dr. Green all the protection he needs? With respect, Your Honor, I actually think the government has been a little bit cagey about whether it's actually okay what Dr. Green wants to do. It wasn't cagey just now. That's right. I'm trying to clarify. It's in F-4 and it says, it says no irreparable injury because the government has assured us that nothing he, that anything he says in his claim wants to do does not violate the statute. Doesn't that satisfy him? Don't we just have to deal with Wong then? Well, given that he has been waiting to publish his book for five years and who knows how long it will be before this case actually ends. I think he does continue to have a credible risk because we may have a new attorney general and a new government. Wait a minute. Wait a minute. Do you think a future attorney general is going to look at a D.C. Circuit opinion that says everything he wants to do is legal and the government has said so? It's going to say, wait, I've changed my mind? We do this all the time in cases where we build into an opinion a representation made by the government and I've never, ever heard of anybody thinking that wasn't sufficient to protect the client. Well, I do appreciate the government's representation, but what I want to be clear about is what Dr. Green needs to do, which is he needs to publish his research and also the code itself because we'll find other vulnerabilities in that code. He just said he can do that. That's what he just said. Well, I'm glad I wish he had said that in a brief where the government had said so. Well, Judge Walker quoted their statement in the district court where they said that. That's correct. And I do think that I do think that helps alleviate Dr. Green's concerns. However, it is trying really hard not to win this case right away. Well, it's been a while. You want to talk about what you talk about? Which I've consumed. I'm sorry. We're talking about Mr. Wong. Certainly. So I would like to make two legal points, but I think we focus somewhat on the facts. One is that we've talked a lot about whether the regulation is content based or not. And we haven't talked a lot about whether the regulation can pass intermediate scrutiny. And I would just say that the government just now explained the whole purpose. The government's purpose in passing the Digital Money and Copyright Act was to protect the market for a particular set of works. Twenty years later, and this goes directly to burden, the reach of the Digital Money and Copyright Act, because it applies to copyrighted software, reaches far beyond any of the government's initial intent. And that goes to weighing whether we have a close fit to means an end. And related to that, the back and forth with the government leads me to invite the narrowing construction that we proposed. If the government is really only concerned with marketing for infringing purposes and with accessing for infringing purposes, then an easy way to get there that resolves for the most part the speech concerns here now and going forward is to adopt the narrowing construction. And the last point I'd like to make is that going back to your question regarding the City of Austin and whether we are getting guidance from the Supreme Court to really try to adhere in our jurisprudence to historically protected speech, I would submit to you that fair use is absolutely historically respected speech and protected speech, and we have that affirmed recently in the Golan case and before that in Eldred, which stressed the importance of fair use in balancing the Copyright Clause and the First Amendment. And that goes back to the Constitution. Thank you very much, Ms. McSherry. The case is submitted.
judges: Walker, Rogers, Tatel